JOHNSON, Judge.
These cases were consolidated in the lower court for trial and in this court for argument. There was judgment for plaintiff in each case. The cases are now before this court on a suspensive appeal by defendant, Parish of Jefferson.
On March 30, 1962, Ruckstuhl & Fick, Inc., (hereinafter referred to as Contractor) entered into a written contract with the Parish of Jefferson, Governing Authority of the East Jefferson Waterworks District No. 1, (hereinafter referred to as Parish) to make repairs to five settling basins located East of the Mississippi River in Jefferson Parish for the sum of $81,-511.00. The contract provided that the Contractor would perform all work and services in accordance with the contract documents prepared by T. Edward Ernst, Consulting Engineer, employed by the Parish. On April 18, 1962, the Contractor made a subcontract with Frank C. Voss Co., Inc., (hereinafter called Subcontractor) to perform certain painting and sandblasting of the settling basins for the price of $15,275.00, which work it contends was performed in a workmanlike manner under the direct supervision of a Mr. Flotron, representing the Parish engineer.
On August 4, 1965, the Contractor instituted suit against the Parish, the Subcontractor and other parties connected with the project by written petition for a declaratory judgment to recover the sum of $29,285.39 for work completed under the contract and for “change orders and extras.” The next day the Subcontractor filed suit against the Contractor and the Parish in solido to recover $60,567.21 including $15,275.00, for the painting and sandblasting under its subcontract, for which amount it had previously filed a materialman’s lien for labor and material used on the job.
After issue was joined, the two suits were consolidated for the purpose of trial. After a three-day trial, judgment was rendered on April 25, 1967, in each suit: (1) In the suit by the Contractor the judgment was in favor of the Contractor and against the Parish for $23,793.29, with interest and costs; the reconventional demand by the Parish against the Contractor and the *172 third-party demand against the Contractor’s bonding insurance company for de-murrage were dismissed. (2) In the suit by the Subcontractor against the Contractor and the Parish there was judgment in favor of the Subcontractor for $15,567.21, with interest and costs; a third-party demand in this suit by the Parish against the Contractor was dismissed.
On May 5, 1967, the Parish filed two motions, one for a new trial and one for a suspensive appeal. On May 8 the trial judge granted a suspensive appeal from the two judgments signed April 25, 1967, the appeal to be returnable to the Fourth Circuit Court of Appeal on June 30, 1967. On the same day, May 8, the trial court signed one order for a rule to issue calling upon the plaintiffs in the two cases to show cause on May 15, 1967, why a new trial should not be granted limited to the correction of the calculation of the amounts in the judgments. The reason for this was that the original judgments of April 25 required the Parish to pay the total of the two judgments of nearly $40,000.00. The rule was heard on May 15, 1967, and as a result on May 23, 1967, the trial court signed one judgment in the consolidated cases correcting or more particularly explaining that the total obligation of the Parish was $23,793.29, with interest and costs, of which amount $15,567.21, with interest, is to be paid first to the Subcontractor and the remainder of the $23,793.29, with interest, is to be paid to the Contractor.
As noted above, a suspensive appeal was granted on May 8, before the new trial was heard on May 15 and before the correcting consolidated judgment was rendered on May 23, 1967. There was no new motion for an appeal and no other order of appeal entered. No point was made of this by any counsel and properly so for the reason that the correcting judgment of May 23, 1967, had the effect of reinstating the original judgments of April 25, 1967, as corrected. LSA-C.C.P. art. 1951; Sanders v. Pacific Indemnity Company, 186 So.2d 887 (cert. denied).
The Contractor also appealed suspensively only insofar as the judgment is against it and in favor of the Subcontractor.
The Parish had constructed this plant some 12 years before this general contract was entered into between the Parish and the Contractor for major repairs. The plant for purification of water from the Mississippi River consisted of five settling basins. Three of these basins are called precipitators. The other two are called acceptors. They all serve the same functional purpose, though of somewhat different structural design. During the life of these facilities the Parish performed from time to time maintenance consisting of some painting and routine repairs. The specifications in this litigation called for removal of certain structural steel and installation of new steel in the three precipi-tators. The old steel was not removed and no new steel was installed in the acceptors. Removal and installation of the steel, welding and other phases of the work under this contract on the precipitators were let out to other subcontractors. They are not now parties to these suits.
The Subcontractor herein was given the subcontract to do sandblasting and painting in all five basins. This work on acceptor No. 1 was done first. The specifications called for preparation of the old steel by a type of sandblasting referred to as No. 2 sandblasting. The paint required was a sophisticated system called epoxy. Sandblasting was to clean the surface to be painted of rust, corrosion, etc. The Subcontractor’s work was done under the supervision of Mr. Flotron, an engineer representing T. Edward Ernst, for the Parish. Mr. Voss testified that Mr. Flotron devoted much time and close inspection and supervision of this job as the work progressed. When the sandblasting preparation was completed on acceptor No. 1 he approved it and ordered the paint applied. When the painting was finished Mr. Flo- *173 tron approved and accepted the work as being in compliance with the specifications. The Parish then paid the Contractor for the sandblasting and painting job on acce-lator No. 1, but later when defects developed a back charge for the amount was made against the contractor.
Mr. Voss testified that within about a month or so rust spots and pin holes did appear, which would require pointing-up. This he did under the supervision of Mr. Flotron. The Parish put the basin into use until October of that year when accelator No. 1 was drained and it was discovered that there was considerable rust and weld splatter, particularly in areas at the old steel welded joints. Mr. Voss contends that he could have corrected that even at that time, but the Parish would not permit him to do it. The surface of the steel in accelator No. 1 was not in good condition when the work started, but it must be remembered that this was the first major conditioning that had been attempted since its construction about 1950.
The Subcontractor complied with the specifications in the sandblasting of accelator No. 1 to prepare the surface to receive the paint. Mr. Flotron, a qualified engineer for the Parish, was continuously on the job and the application of the paint was done under his supervision. Apparently, sandblasting No. 2 did not properly prepare the surface completely. For the other basins, the specifications were changed to require sandblasting No. 1. Therefore, the Parish cannot now complain if the end result was not satisfactory.
One of the testing laboratory experts employed by the Parish testified that in ac-celator No. 1 the steel had lost its life and new steel should have been installed. The specifications did not require that and the Subcontractor prepared the surface according to the specification as he found it and applied the paint on that surface under the eye of the supervisor for the Parish, Mr. Flotron. LSA-R.S. 9:2771.
In order to clarify the specifications and also to require additional and more exacting performance applicable to the three precipitators, at least five change orders issued from time to time, some of which cost additional money, the payment of which was authorized by resolutions of the Parish Council.
At the time epoxy paint was specified for all basins epoxy was the only type of paint that the Board of Health would approve. After the work on accelator No. 1 was finished the Board of Health permitted a change in the specifications to a vinyl system of paint and a change order was issued to require a more stringent sandblasting, referred to as sandblasting No. 1, which included a grinding operation to clean the surface to the white steel. The vinyl paint was applied and in due course rust appeared. This was new steel in precipitator No. 1 and after its installation the Parish flooded the basin for use because of a water shortage. It is argued that this induced the raw steel to rust quickly. The Subcontractor followed the additional specification requirements in precipitator No. 1. Even after these changes the Parish still complained that the Subcontractor did not comply with the specifications and refused to pay for the work. However, the evidence shows that the Parish put accelator No. 1 and precipi-tator No. 1 in use without permitting or giving the Subcontractor an opportunity to make corrections which the Subcontractor contends it could have done successfully.
The Parish caused long interruptions and delays by using the basins from time to time because of water shortage and other causes, all of which, no doubt, contributed to the difficulties experienced by the Subcontractor.
The work on accelator No. 2 and precip-itator Nos. 2 and 3 was not done by this Subcontractor and these three basins are not involved in this litigation. The disputes amongst these parties involved only accelator No. 1 and precipitator No. 1. *174 Counsel for the Subcontractor explained that after the work was completed by this Subcontractor, except for pointing up unavoidable defects which the Subcontractor contends would have satisfied the objections, these facilities were taken over by the Parish and put into use and are still in use to this day as this Subcontractor left them, which indicates strongly that the complaints could not have been so serious as counsel for the Parish contends. The report of testing laboratory experts of date October, 1963, says that precipitator No. 1 could be “touched up” and saved. The Parish refused to permit the Subcontractor to do that.
The trial court gave written reasons in which we fully concur. We quote excerpts, to-wit:
“This record contains voluminous testimony and no useful purpose will be served by reviewing it in detail.”

“The Court observes from the outset that all parties and their witnesses are apparently in agreement that in a job of this magnitude and performance under these circumstances it is anticipated that after completion a certain amount of touch up work will have to be performed.
“The Parish contends on the basis of the reports of Pittsburgh Testing Laboratory and Delta Testing Laboratory that the welds rusted, that paint was applied over rust scale and in one area the paint had blistered. These reports are relied on (with all other testimony) to establish improper surface preparation.
“There is no doubt, from the evidence, that the surfaces rusted in spots after they had been painted and put into use. The Court is also satisfied from the evidence that the surface preparation was approved by the engineer before the paint was applied. However, it was anticipated that there would be some defects despite inspection by the engineer and these defects would be corrected. Not having afforded the contractor an opportunity to touch-up the bad spots, the Parish cannot now point to the extent of the areas now involved and complain that the work was originally improperly done. In addition, it appears that without grinding off the weld splatter a good paint job could not have been obtained. The [original] specifications did not call for grinding off weld splatter and the testimony reveals that the sandblasting called for by the specifications would not remove such splatter.
“The evidence satisfies the Court that the specifications were defective in that the deteriorated nature of the metal was not taken into consideration, proper surface preparation whether sandblasting to a white finish (which apparently was impossible on Accelator No. 1) was not provided, by the failure to provide for the removal of weld splatter which was known could cause rust and by the application of a particular prime coat contrary to the manufacturer’s specifications.
“In addition, an opportunity was not afforded the contractor to touch-up the rust spots which normally would have occurred. As a result of the lack of opportunity to perform corrective work the condition of the material deteriorated excessively.
“It is the opinion of the Court that the direct cause of the condition now complained of was improper specifications, and the failure of the owner to provide an adequate opportunity to the contractor to touch-up the work after completion.
“Assuming arguendo, that the Parish is correct in its contentions that the work was improperly performed an opportunity should have been afforded the contractor to correct the work and prevent further damage by the spread of rust. At that time, if for valid reason the Parish refused to permit the contractor to go back to the job it should have then contracted and had the work per *175 formed by another contractor in the manner in which it felt it should have been performed, thus establishing not only the quantum of damages, if any, but miniminizing subsequent damage. Instead, the tanks have been in constant use over a period of years without even normal maintenance [as] was customarily performed prior to this contract.
“The Court finds that the contractor has met the burden of proof of establishing that the sandblasting and painting, epoxy and otherwise, was properly performed under the specifications of the contract. In fact, Accelator No. 1 was accepted and payment was made but later charged back to the contractor.”
The plaintiffs in these suits contend that they complied strictly with the specifications and gave the Parish exactly what they contracted to do. The Parish is still not satisfied, but that is not the test. The laboratory technicians employed by the Parish made their tests on this work quite some time after the job on the two basins here involved were completed. We agree with counsel for the Subcontractor that the one man best qualified to inform the Court of the true situation and condition was Mr. Flotron who was thoroughly familiar with every step of the work. He represented the Parish. He was not called as a witness. Counsel for the Subcontractor said in argument that the Parish knew where this witness was and could have produced him. That counsel said he tried to find Mr. Flotron, but was unable to do so. Therefore, it appears reasonable that the Parish must have known that his testimony would not have been in support of its position. We think it proper to make that assumption.
For these reasons, the judgment of the District Court of April 25, 1967, as corrected by the trial Court’s consolidated judgment of May 23, 1967, is affirmed. All costs are to be paid by appellant as provided by law.
Affirmed.